[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-12007
_____

D.C. Docket No. 3:09-cv-998-HES-JRK

RONALD COLBERT,
JERRI COLBERT,

Plaintiffs-Appellees,

versus

UNITED STATES OF AMERICA,

Defendant-Appellant,

KANDIS MARTINE, et al.,

Defendants.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(May 7, 2015)

Before WILSON and ANDERSON, Circuit Judges, and VOORHEES,* District
Judge.

---

*  Honorable Richard Voorhees, United States District Judge for the Western District of
North Carolina, sitting by designation.

VOORHEES, District Judge:

## I.

The United States challenges subject matter jurisdiction, namely, the district court's partial summary judgment ruling that, under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346 *et seq.*, and pursuant to the self-determination contract entered into between the United States Department of Interior, Bureau of Indian Affairs ("BIA") and the Navajo Nation Tribe, 25 U.S.C. § 450f[1], Navajo Nation Department of Justice ("NNDOJ") Attorney Kandis Martine was "deemed" an employee of the BIA and afforded the full protection and coverage of the FTCA. The district court determined that given Martine's role in connection with the Navajo Nation Child & Family Services Program ("NNCFS"), and its efforts to oppose the adoption of a Navajo child by a non-Navajo family in Florida state court, Martine was entitled to protection under the FTCA. As a result, the district court dismissed Martine from the lawsuit and held that the United States was the proper party-defendant, 28 U.S.C. § 2679(d)(3). On appeal, the United States contends the district court erred in finding as a factual matter that Martine was "carrying out" work under the self-determination contract. The United States asserts that the decision to afford Martine FTCA coverage, allegedly based upon

---

[1] All citations to the United States Code and the Code of Federal Regulations are to the most recent edition, unless otherwise noted.

erroneous factual findings, constitutes an impermissible extension of the Government's waiver of sovereign immunity.

Pursuant to the Indian Self Determination and Education Assistance Act ("Self-Determination Act" or "ISDEAA"), codified principally at 25 U.S.C. § 450, *et seq.*, Congress created a mechanism for Indian tribes and tribal organizations to enter into agreements with the United States providing for the tribe or organization to assume responsibility for programs or services to Indian populations that otherwise would be provided by the Federal government.[2] *See* Pub. L. No. 93−638, 88 Stat. 2203 (1975).

In 2006, the BIA and the Navajo Nation entered into a three-year self-determination contract (or '638 contract), effective January 1, 2006 through December 31, 2008, which generally provides for the Navajo Nation to deliver an array of social services to Navajo children and their families. Prior to 2006, these social services were administered by the BIA under the Indian Child Welfare Act ("ICWA"), 25 U.S.C. §§ 1901−1963. ICWA's objective is "to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families . . . by providing for assistance to Indian tribes in the operation of child and family service programs." *Id.* § 1902. Of particular relevance here is

---

[2] A "self-determination contract" is "a contract . . . between a tribal organization and the appropriate Secretary for the planning, conduct and administration of programs or services which are otherwise provided to Indian tribes and their members pursuant to Federal law." 25 U.S.C. § 450b(j). The self-determination contracts provide for the allocation of federal funds to the tribe or organization assuming responsibility for these programs or services. *Id.* § 450j-1.

ICWA's goal "to prevent the breakup of Indian families and, in particular, to insure that the permanent removal of an Indian child from the custody of his parent or Indian custodian shall be a last resort." *Id.* § 1931(a). In connection with the '638 contract at issue here, the Navajo Nation established the Navajo Nation Child & Family Services Program and charged NNCFS with the delivery of social services to Navajo families in compliance with ICWA.

In or around March 2007, the Navajo Nation was notified of a potential adoption of a Navajo child by a non-Navajo family and a related hearing scheduled for April 2, 2007 in Jacksonville, Florida.[3] The Navajo Nation referred the case to the NNCFS ICWA Unit, which was advised that the presiding state court judge was not following ICWA's placement preference. The Navajo Nation objected to the proposed adoptive placement. During NNCFS's staffing of cases with the NNDOJ, the Director of the NNCFS Program, Regina Yazzie, elected to involve NNDOJ Attorney Kandis Martine.

As an attorney for the NNDOJ, Martine serves as "the legal representative for the NNCFS Program." According to Martine, she dedicates more than half of her time working for the NNCFS and approximately twenty percent of her time working alongside the ICWA Unit at NNCFS. Martine, described by Yazzie as an

---

[3] A Navajo mother relinquished her parental rights and the Navajo child was being placed up for adoption. *See in re: The Adoption Of: Baby Boy Billy, A Minor,* Fourth Judicial Circuit, Duval County, Florida. (Supp. App. 005). ICWA provides Indian tribes the right to intervene "[i]n any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child . . . ." 25 U.S.C. § 1911(c)(1978).

"expert on ICWA," was asked to attend the state court adoption hearing along with a NNCFS ICWA Unit social worker.    Martine obtained approval from her immediate supervisor, Assistant Attorney General, at the NNDOJ to travel to Jacksonville for the adoption hearing.  The funds used for Martine's travel were provided by the NNCFS.  The Navajo Nation, through Martine, also retained a Florida adoption lawyer, Attorney Jodi Seitlin, to represent its interests in the state proceeding.  Although not licensed to practice law in the State of Florida, Martine was expected to educate Seitlin about ICWA and monitor the state court adoption proceeding relative to ICWA compliance.

On the morning of April 2, 2007, while in Jacksonville, Florida for the hearing, Martine and NNCFS social worker, Lucy Laughter-Begay, were in a car accident.  At the time of the accident, Martine and Laughter-Begay were traveling to Seitlin's downtown office prior to the 10:00 a.m. hearing.  Martine, the driver of the rental car, traveled the wrong direction on a one-way street and caused a car occupied by Ronald and Jerri Colbert to rear-end another vehicle, injuring both of the Colberts and precipitating the instant civil action.

On October 2, 2009, after waiting six months for a response from the United States to the Colberts' administrative claims, the Colberts commenced litigation in the United States District Court, Middle District of Florida, against the United States, Martine, and P.V. Holding Corporation, d/b/a "Budget Rent-A-Car System,

5

Inc." ("Budget").[4]  The Colberts' complaint alleged negligence and loss of consortium claims against the United States and Martine, and negligence, loss of consortium, and dangerous instrumentality claims against Budget.

The Colberts named the United States as a party-defendant based upon the Navajo self-determination contract.  *See* 25 U.S.C. § 450f(a)(1)(b).   Inclusion of the United States as a party was premised on the theory that Martine is considered a federal employee for purposes of the FTCA when performing work under the self-determination contract.  § 450f(c)(1).

After the lawsuit was filed, the BIA denied both administrative claims on grounds that Martine was not a federal employee.  Similarly, the United States Attorney for the Middle District of Florida declined to certify that Martine was an "employee of the Government" acting within the scope of her employment under

---

[4]  On November 24, 2008, as a prerequisite to filing a claim under the FTCA, the Colberts submitted administrative claims with the BIA pursuant to 28 U.S.C. § 2675(a).  Title 28, United States Code, Section 2675(a) reads:

> An action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail. The failure of an agency to make final disposition of a claim within six months after it is filed shall, at the option of the claimant any time thereafter, be deemed a final denial of the claim for purposes of this section . . . .

28 U.S.C. § 2675(a).

28 U.S.C. § 2679(d)(1).[5]

On October 25, 2010, the United States moved to dismiss the claims brought against the government pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.  The Colberts and Martine moved for partial summary judgment the same day, asking the Court to rule as a matter of law that FTCA coverage was available to Martine.

During the pendency of these motions, Ronald Colbert died and his wife became the designated personal representative for his estate.  On March 29, 2011, a Second Amended Complaint was filed adding a wrongful death claim and, alternatively, a survival action pursuant to Florida law.

On May 13, 2011, the district court denied the United States' motion to dismiss and the Colberts' and Martine's motions for partial summary judgment. With respect to subject matter jurisdiction, the district court found that whether Martine could properly be deemed a federal employee required an analysis of the merits and further development of the record.  *See* Fed. R. Civ. P. 12(b)(1).  The

---

[5]   Title 28, United States Code, Section 2679 provides for the exclusiveness of remedies against the United States for claims cognizable under the FTCA, 28 U.S.C. § 1346(b).  Title 28, United States Code, Section 2679(d)(1) reads in pertinent part:

> Upon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim in a United States district court shall be deemed an action against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant.

28 U.S.C. § 2679(d)(1).

court also found that, at that stage of the case, genuine issues of material fact precluded decision on the FTCA coverage issue. *See* Fed. R. Civ. P. 56.

In the fall of 2012, following discovery, the Colberts renewed the motion for partial summary judgment on the same FTCA issue and Martine joined in the motion. Martine's motion also encompassed a request that the district court find and certify under 28 U.S.C. § 2679(d)(3) that Martine is entitled to FTCA coverage.[6] Although the motion was styled as a summary judgment motion, the court construed it as a petition for certification under § 2679(d)(3). On a more developed evidentiary record, the district court reconsidered its May 13, 2011 decision that summary judgment disposition was precluded and held on November 21, 2012 that subject matter jurisdiction was present pursuant to the FTCA, 28 U.S.C. § 1346(b). Martine was dismissed from the case and the United States was substituted as contemplated by 28 U.S.C. § 2679(d)(3). The claims against Budget were dismissed at summary judgment.

---

[6] When the Attorney General elects not to certify that the defendant was an employee, or was acting within the scope of office or employment under § 2679(d)(1), § 2679(d)(3) permits certification by the U.S. District Court. Subsection 2679(d)(3) reads in pertinent part:

> In the event that the Attorney General has refused to certify scope of office or employment under this section, the employee may at any time before trial petition the court to find and certify that the employee was acting within the scope of his office or employment. Upon such certification by the court, such action or proceeding shall be deemed to be an action or proceeding brought against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant. . . .

28 U.S.C. § 2679(d)(3).

The district court presided over a five-day bench trial held June 10, 2013 through June 14, 2013 to determine liability and damages.  On November 20, 2013, the court issued findings of fact and conclusions of law.  The trial judge found the United States eighty percent at fault and Mr. Colbert twenty percent at fault.  The United States was ordered to pay the Colberts more than 2.6 million dollars in damages.  On March 6, 2014, upon a Rule 59(e) motion filed by the Government, the damages award was subsequently reduced, resulting in a final judgment against the United States in the amount of $2,599,691.20.

On appeal, the United States challenges the applicability of the FTCA under these facts.  The district court's findings concerning liability and damages are not at issue.

On March 12, 2015, the Navajo Nation was granted leave of this Court to participate as *amicus curiae*.  The Navajo Nation urges the Court to affirm in recognition of the objective of the ISDEAA and implications for future tribal employees performing '638 contract functions.

## II.

This Court "review[s] *de novo* a district court's determination of whether it has subject-matter jurisdiction."  *Gupta v. McGahey*, 709 F.3d 1062, 1064−65 (11th Cir. 2013). The district court's interpretation or construction of a statute is

9

also subject to *de novo* review. *Bankston v. Then*, 615 F.3d 1364, 1367 (11th Cir. 2010).

## III.

Having conducted a *de novo* review, we conclude that the district court's decision concerning subject matter jurisdiction is consistent with ISDEAA's statutory scheme, the terms of the governing self-determination contract, and the record evidence. We begin by considering the origin of ISDEAA.

The Congressional statement of findings present in 25 U.S.C. § 405 provides that:

> The Congress, after careful review of the Federal government's historical and special legal relationship with, and resulting responsibilities to, American Indian people, finds that − the prolonged Federal domination of Indian service programs has served to retard rather than enhance the progress of Indian people and their communities by depriving Indians of the full opportunity to develop leadership skills crucial to the realization of self-government, and has denied to the Indian people an effective voice in the planning and implementation of programs for the benefit of Indians which are responsive to the true needs of Indian communities.

25 U.S.C. § 450(a)(1). Based upon these Congressional findings, the United States declared as policy "the obligation of the United States to respond to the strong expression of the Indian people for self-determination by assuring maximum Indian participation in the direction of. . . Federal services to Indian communities . . . ." *Id.* § 450a(a). Likewise, the Congress declared its commitment to

10

"establish[] a meaningful Indian self-determination policy which will permit an orderly transition from the Federal domination of programs for, and services to, Indians to effective and meaningful participation by the Indian people in the planning, conduct, and administration of those programs and services." *Id.* § 450a(b).

The Indian Self Determination and Education Assistance Act implements this policy. However, as originally enacted, ISDEAA failed to account for the problem of liability insurance for tribal employees who "step into the shoes" of the federal government pursuant to these self-determination contracts. *See FGS Constructors, Inc. v. Carlow*, 64 F.3d 1230, 1234 (8th Cir. 1995) ("Congress acknowledged that the tribal governments, when carrying out self-determination contracts, were performing a federal function and that a unique legal trust relationship existed between the tribal government and the federal government in these agreements."); *see also* S. Rep. No. 107−324, at 2 (2002), *available at* 2002 WL 31474281 ("The Self Determination Act authorizes Indian tribes and tribal consortia to 'step into the shoes' of the United States and assume responsibility and managerial control of services and programs previously administered by the Federal government."). As a result, tribal employees performing what would otherwise be "federal" work did not enjoy FTCA protection.

In 1990, Congress took additional measures and amended ISDEAA by

11

requiring the BIA to obtain liability insurance "for Indian tribes, tribal organizations, and tribal contractors carrying out" self-determination contracts. 25 U.S.C. § 450f(c)(1). Section 314 of the ISDEAA provides in pertinent part:

> With respect to claims resulting from the performance of functions . . . under a contract . . . authorized by the [ISDEAA] . . ., an Indian tribe, tribal organization or Indian contractor is deemed hereafter to be part of the Bureau of Indian Affairs in the Department of the Interior . . . while carrying out any such contract . . . and its employees are deemed employees of the [BIA] . . . while acting within the scope of their employment in carrying out the contract . . . . [A]fter September 30, 1990, any civil action or proceeding involving such claims brought hereafter against any tribe, tribal organization, Indian contractor or tribal employee covered by this provision shall be deemed to be an action against the United States and will be defended by the Attorney General and be afforded the full protection and coverage of the Federal Tort Claims Act . . . .

See Pub. L. No. 101− 512, § 314, 104 Stat. 1915 (1990) (codified at 25 U.S.C. § 450f notes). Therefore, as a result of the 1990 Amendment to ISDEAA (commonly referred to as "Section 314"), Congress provided that Indian tribes, tribal organizations, Indian contractors, and their employees, may be deemed employees of the BIA for purposes of the FTCA when they are carrying out functions authorized in or under a self-determination contract. Id.

Federal regulations confirm the intended breadth of ISDEAA's FTCA protection. In addition to offering FTCA protection to tribal employees paid directly pursuant to '638 contracts, FTCA coverage is available to tribal employees

12

who are paid from funding derived from a source other than self-determination

contract funding "*as long as the services out of which the claim arose were*

*performed in carrying out the self-determination contract*."  *See* 25 C.F.R. §

900.197 (emphasis added).[7]

## IV.

As a matter of first impression, we consider the plain meaning of Section

314 of the Self-Determination Act and hold that the statutory language is

unambiguous. *See Lowery v. Alabama Power Co.*, 483 F.3d 1184, 1199 (11th Cir.

2007) (internal citations omitted).  Accordingly, to the extent not already defined

by statute, we assign all terms their ordinary meaning.[8]  *Id.*

---

[7]  Title 25, Section 900.197 of the Code of Federal Regulations, asks and answers the question:

> Does FTCA cover employees of the contractor who are paid by the contractor from funds other than those provided through the self-determination contract?
> Yes, as long as the services out of which the claim arose were performed in carrying out the self-determination contract.

25 C.F.R. § 900.197.  Section 900.197 was promulgated after public notice and comment and has the force and effect of law.  *See Perez v. Mortgage Bankers Ass'n*, 135 S.Ct. 1199, 1203 (2015) ("Rules issued through the notice-and-comment process are often referred to as 'legislative rules' because they have the 'force and effect of law.'") (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 302−03 (1979)).

[8]  The district court aptly noted competing canons of construction advanced by the parties.  First, the "principle of statutory construction that statutes passed for the benefit of dependent Indian tribes are to be liberally construed, with doubtful expressions being resolved in favor of the Indians." (M & O, 23−24) (citations omitted).  Secondly, "[a] waiver of the Federal Government's sovereign immunity must be unequivocally expressed in statutory text, and will not be implied.  Moreover, a waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign." (M & O, 24−25) (citations omitted).

Section 314 expressly provides FTCA coverage to "an Indian tribe, tribal organization or Indian contractor . . . and its employees" that are engaged in "carrying out" functions authorized in or under a self-determination contract. 25 U.S.C. § 450f notes.  The ISDEAA defines the terms "Indian tribe," "tribal organization," and "Indian."[9]   25 U.S.C. § 450b.  For purposes of ISDEAA, "Indian contractor" necessarily refers to a member of an Indian tribe, or "a tribe-related organization that may itself enter into a self-determination contract" as opposed to a private party.  *See FGS Constructors, Inc.*, 64 F.3d at 1234−35 ("Indian contractor" is "limited to a tribe-related organization that may itself enter into a self-determination contract, not a private party . . . that has been retained to work on a project funded by a self-determination contract."); *see also Demontiney v. United States*, 54 Fed. Cl. 780, 786 (Fed. Cl. 2002).

---

Because the district court found Section 314, ISDEAA's FTCA provision, unambiguous, neither of these canons was found to control the analysis.

   [9]  "'Indian tribe' means any Indian tribe, band, nation, or other organized group or community, . . . which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians."  25 U.S.C. § 450b(e).  "'[T]ribal organization' means the recognized governing body of any Indian tribe; any legally established organization of Indians which is controlled, sanctioned, or chartered by such governing body or which is democratically elected by the adult members of the Indian community to be served by such organization and which includes the maximum participation of Indians in all phases of its activities."  *Id.* § 450b(l).  "'Indian' means a person who is a member of an Indian tribe."  *Id.* § 450b(d).

Next, we consider the meaning of "carrying out" in the context of Section 314.[10]  The phrase "to carry out" has been defined as "to put into execution," "to bring to a successful issue," or "[t]o conduct duly to completion or conclusion; to carry into practice or to logical consequences or inferences." *Shirk v. United States*, 773 F.3d 999, 1005 (9th Cir. 2014) (internal citations omitted) (relying on dictionaries for the ordinary meaning of the term at or around the time of the statute's enactment).  Therefore, "carrying out" a self-determination contract simply means to act or perform under the contract.

The term "employee" is defined in part by the contours of the FTCA, which we acknowledge is an exception to the general rule that the United States enjoys sovereign immunity unless that immunity is expressly waived.  *See Means v. United States*, 176 F.3d 1376, 1378−79 (11th Cir. 1999); *see also Suarez v. United States*, 22 F.3d 1064, 1065 (11th Cir. 1994) ("The FTCA is a specific, congressional exception to the general rule of sovereign immunity.").  In *Means*, we explained:

> Congress has authorized a limited waiver of sovereign immunity under the FTCA
>
>> for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee

---

[10]   We observe that this "carrying out" limitation qualifies the group of '638 tribal actors (i.e., "Indian tribe, tribal organization or Indian contractor . . . and its employees") including the potentially eligible tortfeasor-employee, Martine.

> of the Government *while acting within the scope of his office or employment*, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

*Means*, 176 F.3d at 1378−79 (quoting 28 U.S.C. § 1346(b)) (emphasis added); *see also United States v. Orleans*, 425 U.S. 807, 813 (1976). "Whether an individual is an employee of the United States for purposes of the FTCA is determined by federal law." *Means*, 176 F.3d at 1379 (internal citations omitted).

Notwithstanding the United States' contrary position, ISDEAA's Section 314 means exactly what it says. Section 314 expands the United States' waiver of sovereign immunity to Indian tribes, tribal organizations, Indian contractors, and their employees as a means of advancing the "long-standing federal policy of encouraging Indian self-determination, giving Indian tribes control over the administration of federal programs benefitting Indians." *FGS Constructors, Inc.*, 64 F.3d at 1234; *see also Allender v. Scott*, 379 F.Supp.2d 1206, 1218 n.15 (D. N.M. 2005) (responding to policy arguments of the government agencies and noting that Congress settled the question in favor of providing insurance coverage).

In addition, the parties agree that, if properly "deemed" a BIA employee, Martine was acting within the scope of her employment under Florida law and as contemplated within Section 314. Therefore, the sole issue presented for this Court is whether Martine was, in fact, carrying out the Navajo self-determination

16

contract when the car accident occurred and, therefore, properly "deemed" a BIA employee falling within the protection of the FTCA.

In seeking to apply ISDEAA to the facts of this case, we next turn to the Navajo self-determination contract.[11]  *See, e.g.*, 25 U.S.C. § 450l.  The first matters addressed by the self-determination contract are "Authority and Purpose." (Contract, § A).  At the outset, the self-determination contract states that it "is entered into by the Secretary of the Interior [BIA] . . . for and on behalf of the United States pursuant to [ISDEAA] and ***by the authority of the Navajo Nation*** (referred to in this agreement as the 'Contractor')."  (Contract, § A, 1) (emphasis added).  To be clear, the Navajo Nation is the contracting authority – not the NNCFS.  In the following paragraph, the purpose of the self-determination contract is explained:

> Each provision of the [ISDEAA] and each provision of this Contract shall be liberally construed for the benefit of the Contractor to transfer the funding and the following related functions, services, activities and programs (or portions thereof), that are otherwise contractible . . ., including all related administrative functions, from the Federal Government to the Contractor:  Navajo Children and Family Services Program (ICWA).

---

[11]  The Navajo self-determination contract is based on a "model" '638 contract.

17

(Contract, § A, 2).  Thus, the Navajo self-determination contract effectively transfers the BIA's responsibility for ensuring adherence to ICWA to the Navajo Nation.  To that end, the Navajo Nation created and funded NNCFS.

The Navajo self-determination contract incorporates by reference an Annual Funding Agreement ("AFA"), which itself is comprised of multiple funding-related documents, including "Attachment A," entitled "Scope of Work."  The AFA addresses its "Program, Functions, Services and Activities":

> The Navajo Nation shall administer and perform those portions of the [BIA's] Navajo Children & Family Services Program identified in the Scope of Work, . . . in accordance with its own laws and policies and the terms, provisions, and conditions of the Contract and this AFA and any attachments thereto. . . ."

(AFA, § A, ¶ 1).[12]

The Scope of Work attachment identifies the specific goals and tasks to be undertaken by the Navajo Nation under the contract.  Indeed, consistent with ICWA, the Navajo Nation's goals are: "to prevent the break up of Navajo families, to protect the best interest of Navajo children and to promote the stability of Navajo families."  (AFA, Attach. A).  The means for achieving these goals are specifically outlined as eleven enumerated functions within the Scope of Work.  Here, the relevant contract functions are:

---

[12]   Again, although the NNCFS is the designated beneficiary, the signatories to the AFA are the Navajo Nation and the BIA.

5.  Request coordination of legal services from the Navajo Nation Department of Justice on behalf of Navajo children and families, when applicable.

9.  Provide education and training on the provisions of ICWA.

11. Monitor the efforts made by the State to comply with the ICWA, such as, placement preference and whether active efforts are being provided.

(AFA, § A, ¶¶ 5, 9, 11).

In addition to setting out the boundaries of the self-determination contract, the AFA speaks directly to application of the FTCA.  Under the "Federal Tort Claims Act" section of the AFA:

For purposes of Federal Tort Claims Act coverage, ***the Navajo Nation and its employees*** are deemed to be employees of the Federal government while performing work under the contract.  This status is not changed by the source of the funds used by the Navajo Nation to pay the ***employees*** [*sic*] salary and benefits unless the employee receives additional compensation for performing covered services from anyone other than the Navajo Nation.

(AFA, § O) (emphases added); *see* 25 C.F.R. § 900.186(a) (model FTCA clause). The AFA speaks broadly in terms of FTCA coverage being available for ***all Navajo Nation employees*** assuming the other statutory criteria are met.  *Id.* Consistent with Section 314 of ISDEAA, the AFA does not limit FTCA coverage to employees of the NNCFS.

19

In this case, Martine works for the NNDOJ, which in and of itself is not a party to, nor designated beneficiary of, any '638 contract.[13]  However, Martine is a member and employee of the Navajo Nation, a recognized eligible Indian tribe as defined by ISDEAA. *See* 25 U.S.C. § 450b(e).  In sum, given the aims of ISDEAA, and the terms of the Navajo self-determination contract, we conclude that, for purposes of the debated FTCA coverage, the relevant limiting principle is the alleged tortfeasor's performance of identifiable '638 contract functions – "carrying out" the self-determination contract. Thus, the *actual work performed* by Martine is the focus of our factual inquiry.

## V.

The district court properly found as a fact that Martine was "carrying out" the self-determination contract by performing functions identifiable in, and expressly authorized by or under, the contract, namely, Scope of Work Functions 9 and 11.  According to the Government, Martine's licensure as an attorney, including her purported performance of "legal services" in connection with the Jacksonville, Florida adoption proceeding, is dispositive of the issue and precludes

---

[13]  As already noted, the fact that Martine's salary was not paid directly via '638 contract funds is not determinative.  *See* 25 C.F.R. § 900.197. The NNDOJ receives federal funding indirectly for its employees' '638 contract work.  There is also provision within ISDEAA for "contract support costs" for funding activities necessary to ensure compliance with the '638 contract goals.  25 U.S.C. § 450j-1(a)(2).

20

FTCA coverage.  Given that Martine performed at least two other identifiable functions under the Navajo self-determination contract, we need not decide whether Martine actually performed legal services.[14]

In this instance, Martine testified that her work for the NNCFS was consistent with, and in furtherance of, the prescribed '638 contract goals:

> "To assist our contract attorney on an adoption case in the state court of Florida."

> "[T]elling [the contract attorney] what ICWA is, providing her guidance on how the case should go, but leaving it to her as the legal representative."

> "I was present in the state of Florida for an Indian child welfare case that fell under the federal law of the Indian Child Welfare Act, in that a mother relinquished her rights to her child and requested that the child be adopted by a nonnative family.  Navajo Nation objected to that. And we wanted the state court, as well as the adoptive family to realize that under the federal law, the placement preferences are that the child be placed with a Navajo family.
> So my intention as a representative – a legal representative of Navajo Child & Family Services was to assist them by, first of all, locating a contract attorney to

---

[14]   Martine's primary role did not entail the performance of "legal services." Rather, separate counsel was retained to represent the interests of the Navajo Nation in the Jacksonville, Florida adoption proceeding.  Although licensed as an attorney in the States of New Mexico, Washington, and within the Navajo Nation, Martine was not licensed to practice law in the State of Florida. Martine was not admitted *pro hac vice* and did not enter an appearance on the record as counsel. Beyond answering questions posed to her by the Court, Martine did not make legal arguments, present legal briefs, or address the Court for purposes of representing NNCFS. Moreover, even if Martine was engaged in helping to develop the NNCFS legal strategy with the Florida adoption attorney, there is no provision within ISDEAA, the Navajo self-determination contract, or any other statute or applicable regulation that purports to restrict Martine from performing legal services while contemporaneously carrying out the '638 contract.

> represent us in the court and to assist that contract
> attorney with the complexities of the Indian Child
> Welfare Act . . . ."

In other words, consistent with Scope of Work Function 9, Martine made herself available to the Navajo Nation's contract attorney, Jody Seitlin, to educate and train Seitlin (and possibly others involved in the adoption proceeding) on ICWA. Similarly, Martine's physical presence at the adoption hearing enabled Martine to monitor first-hand the State's efforts to comply with ICWA as outlined by Scope of Work Function 11. The evidentiary record supports the district court's finding that, at the time of the accident, Martine was carrying out work falling squarely within the Navajo self-determination contract.

Likewise, the district court properly found that Martine was sufficiently qualified to perform Scope of Work Functions 9 and 11, and eligible for FTCA protection, despite her professional status as an attorney. The Government argues that attorneys are not contemplated by the '638 contract that governs here. Appellees, on the other hand, argue that under ISDEAA, the Indian tribe must be allowed discretion to determine who is needed to carry out the '638 contract.

There is no support within Section 314, or the Navajo self-determination contract itself, for the proposition that a tribal attorney is *ipso facto* not *qualified* to perform traditional social work tasks. The Government points to the "Personnel Management" section within the AFA that reads in part:

22

> [A]ll personnel employed by the Navajo Nation to
> carry out the Contract and this AFA shall meet the
> qualifications set forth by the Navajo Nation Department
> of Personnel Management . . . .

(AFA § I.2).  The Government argues that, in light of the need to strictly construe

waiver of its sovereign immunity, the proper construction of the '638 contract is to

require a staffing plan that identifies "key personnel" and their qualifications in

order to limit employee eligibility for FTCA protection.  *See* 25 C.F.R. §

23.23(b)(6)(i)−(ii).[15]  More specifically, the United States contends that for

purposes of FTCA, "key personnel" should be limited to those positions set out

within the Program Budget and Description of Positions attachments to the AFA.

The Government relies on the *Shirk* decision for this proposition, which we find

unpersuasive.  *See*, *Shirk*, 773 F.3d at 1006−07 (observing in dictum that "[i]f a

court determines that the relevant federal [self-determination] contract does not

encompass the activity that the plaintiff ascribes to the employee, or if the

---

[15]    Section 23.23 of the Code of Federal Regulations prescribes mandatory tribal applications requirements for '638 contracts, including:

> A staffing plan that is consistent with the implementation of the above-described program plan of operation and the procedures necessary for the successful delivery of services.

> The plan must include proposed key personnel; their qualifications, training or experience relevant to the services to be provided; responsibilities; Indian preference criteria for employment; and position descriptions.

25 C.F.R. § 23.23(b)(6)(i).  Here, the Navajo self-determination contract includes a staffing plan in the Scope of Work and other AFA attachments.

23

agreement covers that conduct, ***but not with respect to the employee in question***, there is no subject matter jurisdiction.") (emphasis added).

Admittedly, the AFA does not include the position of "attorney" within its listing of budgeted NNCSF personnel.   However, "guidance, legal representation, and advice to Indian families" involved in child custody proceedings is precisely the type of child and family program envisioned by ICWA.  *See* 25 U.S.C. § 1931(a); 25 C.F.R. §§ 23.13(a)−(f) and 23.22(a)(6)(2014).[16]  In fact, the evidence tends to show that the NNCFS and NNDOJ often worked in tandem to accomplish these and other ICWA objectives on behalf of the Navajo Nation.  Most importantly, to accept the Government's proposed construction would require the Court to ignore the more specific AFA FTCA clause, which expressly states that coverage under the FTCA is available to ***"any Navajo Nation employee"*** carrying

---

[16]   Section 23.22 of Title 25 of the Code of Federal Regulations identifies the purpose of tribal government grants to Indian Tribes under ICWA as for the establishment and operation of tribally designed Indian child and family service programs.  Section 23.22 reads in part:

> The objective of every Indian child and family service program
> shall be to prevent the breakup of Indian families and to ensure that
> the permanent removal of an Indian child from the custody of his
> or her Indian parent or Indian custodian shall be a last resort.  Such
> child and family programs may include, but need not be limited to:
>
> (8) ***Guidance, legal representation and advice to Indian families
> involved in tribal, state, or Federal child custody proceedings*** . . .
> .

25 C.F.R. § 23.22(a)(8) (emphasis added).

out work under the '638 contract.[17]

## VI.

Finally, we also hold that provision of FTCA coverage to Martine and the substitution of the United States under 28 U.S.C. § 2679(d)(3), does not constitute an improper extension of the waiver of sovereign immunity. First, as previously discussed, Section 314 of ISDEAA is unambiguous and plainly extends the United States' waiver of sovereign immunity to Indian tribes, tribal organizations, Indian contractors and their employees that are engaged in "carrying out" functions authorized in or under a self-determination contract. Secondly, because Martine's work fell squarely within the identifiable functions of the Navajo self-determination contract, the district court's application of the law to these facts comports with the above-referenced sovereign immunity principles, including the FTCA.

**AFFIRMED**.

---

[17] Advancing the same sovereign immunity argument in a different manner, the United States contends that Congress did not intend for FTCA coverage to extend to tribal employees acting in roles not traditionally filled by the BIA. The United States claims that because the BIA would not have hired a federal lawyer to represent the interests of the Navajo Nation Tribe (as opposed to the interests of Navajo children and families), Martine cannot be entitled to FTCA coverage. The United States attempts to draw a distinction between the respective interests of the Navajo Nation and Navajo children and families that does not exist. The United States' argument cannot be reconciled with ICWA, which expressly and unequivocally aligns the Navajo Nation's interests with the interests of its members − Navajo children and families. *See* 25 U.S.C. § 1931(a). The Tribe's ideal to preserve the Navajo family unit to the extent possible is merely one example of their common interests. *See id*. § 1902 (ICWA's objective is "to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families . . . .").