[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-10160
_____

D.C. Docket No. 7:09-cr-00018-WLS-TQL-1


UNITED STATES OF AMERICA,

Plaintiff–Appellee,

versus

RICHARD A. CHAFIN,

Defendant–Appellant.


_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

(October 28, 2015)

Before JORDAN and DUBINA, Circuit Judges, and GOLDBERG,[*] Judge.

---

[*] Honorable Richard W. Goldberg, United States Court of International Trade Judge, sitting by designation.

DUBINA, Circuit Judge:

Richard Chafin appeals his convictions for federal-program embezzlement, in violation of 18 U.S.C. § 666, and for obstructing justice by hindering the communication of information about a potential federal offense to federal officials, in violation of 18 U.S.C. § 1512(b)(3). After reviewing the record, reading the parties' briefs, and having the benefit of oral argument, we affirm Chafin's embezzlement conviction, vacate his § 1512(b)(3) conviction, and remand to the district court for further proceedings consistent with this opinion.

**I.**

In 2009, a federal grand jury indicted Chafin on one count of federal-program embezzlement and one count of obstructing a federal investigation. He pleaded not guilty and waived his right to trial by jury. During a two-day bench trial in May 2010, the government presented evidence of the following.

Chafin served as the Sheriff of Brooks County, Georgia for almost 20 years. In 2007 and 2008, his last two years in office, 225 checks totaling $65,730 were drawn on the jail commissary account and made payable to and cashed by him. During this period, both a clerk and an administrative assistant in the sheriff's department asked him about the checks. He told them that the funds were to pay an unnamed confidential informant. But according to five employees of convenience stores near the sheriff's department, Chafin frequently came into their stores, cashed checks from the jail commissary account, and used the money to buy lottery tickets.

2

In both 2007 and 2008, Brooks County received federal funds in excess of $10,000.  Indeed, over fiscal year 2007 (October 2006 through September 2007), the county received $33,897 in federal funds, and it received the same amount over the next fiscal year.  These funds were part of a grant from the Office for Victims of Crime, which Congress created to disburse funds under the Victims of Crimes Act, and they were used to cover some of the personnel and operating costs associated with the witness-advocate position in the sheriff's department.  According to Robert Thornton, the state official who oversaw these grants' disbursement, at least $25,000 of the witness advocate's salary each year was paid from these funds.  Thornton also estimated that during the 2007 and 2008 calendar years Brooks County received $42,000 and $25,000, respectively.

Chafin was defeated by Mike Dewey in the 2008 election.  After taking office, the newly elected sheriff engaged a certified public accountant to review the department's financial records.  The accountant's review unearthed the checks written to and cashed by Chafin from the jail commissary account.  The accountant's review, however, did not uncover any documents supporting Chafin's claim that he paid a confidential informant with these funds.

The Georgia Bureau of Investigation ("GBI") began an investigation into the alleged misuse of jail commissary funds.  GBI Agent Michael Callahan interviewed Chafin about the jail commissary account.  At trial, Agent Callahan played an audio recording of this interview.  Before asking any questions, Agent Callahan advised Chafin of his *Miranda*[1] rights and told him that the district

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 444–45, 86 S. Ct. 1602, 1612 (1966).

attorney had requested an investigation into the alleged misuse of jail commissary funds.

Agent Callahan asked Chafin to explain why 225 checks had been drawn on the jail commissary account and made payable to and cashed by him. Chafin did not deny cashing the checks, but he did deny buying lottery tickets with these funds. He told Agent Callahan that much of this money went to Joshua Wolfe, his confidential informant, though Chafin denied paying Wolfe over $60,000. Chafin added that he paid another informant several thousand dollars for information about a Mexican drug deal in the area.

Chafin then explained to Agent Callahan that he viewed these payments as an investment in the seizure proceeds that would likely follow. And when the jail commissary account ran low, he asked the county to move funds from the drug seizure account to the jail commissary account, thus allowing him to keep paying his informants. Chafin told Agent Callahan that while no one in the sheriff's department knew about his informants, he had records in the office showing where they signed for their payments. A subsequent GBI search for Chafin's confidential-informant records came up empty.

Joshua Wolfe committed suicide in December 2008. While Chafin claimed to have paid Wolfe large sums of money as a confidential informant, those closest to him saw no evidence of this. His wife did not know that he was an informant, nor did she believe that he was friends with Chafin or had ever mentioned meeting with him. At the time of Wolfe's death, he and his wife were two months behind on their mortgage, facing foreclosure, and paying back taxes. Furthermore, after

4

Wolfe's death, his wife and beneficiary received only $30 from his bank account. Wolfe's neighbor, a former Lowndes County sheriff's deputy, and his coworker, the woman with whom he left his suicide note, likewise did not know that Wolfe was an informant. Nor did they remember him making any noteworthy purchases in 2007 and 2008 other than a used motorcycle that had a lien on it.

Following the government's case-in-chief, Chafin moved for a judgment of acquittal. *See* Fed. R. Crim. P. 29. He contended that the government failed to prove that his conduct hindered federal law enforcement, which he said was required for a conviction under 18 U.S.C. § 1512(b)(3). He also claimed that the government failed to prove that he was guilty of federal-program embezzlement because the evidence did not show that the federal-funds threshold in 18 U.S.C. § 666(b) was met. According to him, because most of the federal funds Brooks County received were used to pay the witness advocate's salary, and because § 666(c) excepts bona fide salaries paid in the usual course of business, the government had not shown that the county received more than $10,000 in federal funds during the one-year statutory period. The district court carried the motion with the case, and Chafin rested without presenting a defense.

In April 2012, the district court issued a written order denying the Rule 29 motion and finding Chafin guilty on both counts. In October, the district court sentenced Chafin to concurrent 13-month terms of imprisonment on each count and imposed a three-year term of supervised release. Four days later, Chafin

5

moved for a new trial based on newly discovered evidence.  The district court denied the motion in December 2013.  This timely appeal followed.[2]

## II.

Several standards of review govern this appeal.  "We review both a challenge to the sufficiency of the evidence and the denial of a Rule 29 motion for judgment of acquittal *de novo*."  *United States v. Gamory*, 635 F.3d 480, 497 (11th Cir. 2011).  We examine the evidence "in the light most favorable to the government and resolv[e] all reasonable inferences and credibility issues in favor of the guilty verdicts."  *United States v. US Infrastructure, Inc.*, 576 F.3d 1195, 1203 (11th Cir. 2009).  We will not overturn a guilty verdict "unless no reasonable trier of fact could find guilt beyond a reasonable doubt."  *United States v. Farley*, 607 F.3d 1294, 1333 (11th Cir. 2010).  Nor will we disturb the denial of a Rule 29 motion so long as a reasonable trier of fact could find guilt beyond a reasonable doubt.  *Gamory*, 635 F.3d at 497.

When a party raises an objection for the first time on appeal, we review for plain error only.  *United States v. Rodriguez*, 751 F.3d 1244, 1251 (11th Cir. 2014).  To prevail under this standard, the party must establish the existence of an error that is plain and that affects substantial rights.  *Id.* at 1252.  The second prong is satisfied if the error is plain at the time of appellate review, even if it was not so at

---

[2] Chafin has completed his term of imprisonment but remains on supervised release until November 2016.  But because he challenges his underlying convictions, collateral consequences are presumed, and this case is not moot.  *See United States v. Juvenile Male*, 564 U.S. ___, ___, 131 S. Ct. 2860, 2864 (2011).

6

the time of trial. *Henderson v. United States*, 568 U.S. ___, ___, 133 S. Ct. 1121, 1130–31 (2013). An error affects substantial rights if, but for the error, the judicial proceeding's outcome would have been different. *United States v. Beckles*, 565 F.3d 832, 844 (11th Cir. 2009). If these conditions are met, we may exercise our discretion to notice the forfeited error, but only if it "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Rodriguez*, 398 F.3d 1291, 1298 (11th Cir. 2005) (quoting *United States v. Cotton*, 535 U.S. 625, 631, 122 S. Ct. 1781, 1785 (2002) (alteration omitted)).

We review the district court's interpretation or construction of a statute de novo. *Colbert v. United States*, 785 F.3d 1384, 1389 (11th Cir. 2015).

## III.

### A.

In 1984, Congress made it a crime for an agent of a covered entity (e.g., a state or local government[3]) to embezzle or convert to his own use property valued at $5000 or more and owned by or under the care, custody, or control of that covered entity. 18 U.S.C. § 666(a)(1)(A). Congress limited the statute's reach to only those covered entities that receive "benefits . . . under a Federal program" of more than $10,000 during "any one-year period." § 666(b).

According to the legislative history, Congress enacted § 666 "to protect the integrity of the vast sums of money distributed through Federal programs from

---

[3] Specifically, the statute covers "an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof," defining the terms *agent*, *State*, *local*, and *government agency* broadly. 18 U.S.C. § 666(a)(1), (d)(1)–(4).

theft, fraud, and undue influence by bribery." *United States v. Keen*, 676 F.3d 981, 990 (11th Cir. 2012) (quoting S. Rep. No. 98-225, at 370 (1983), *as reprinted in* 1984 U.S.C.C.A.N. 3182, 3511)).  Put simply, Congress's purpose was to ensure the integrity of the covered entities receiving federal assistance.  *Id.*  At the same time, the legislative history makes clear that § 666 does not extend to "every Federal contract or disbursement of funds" of more than $10,000.  S. Rep. No. 98-225, at 370.  Rather, the statute's intent was to cover only benefits of a "Federal program," meaning "a specific statutory scheme authorizing the Federal assistance in order to promote or achieve certain policy objectives."  *Id.*  To illustrate the statute's limits, the legislative history explains that an employee who steals $5000 from his employer does not commit a federal crime just because the employer is a supplier from which "a government agency lawfully purchases more than $10,000 in equipment."  *Id.*  In short, the statute's reach is limited.  Even so, given its history and purpose, the Supreme Court has repeatedly rejected "statutory constructions aimed at narrowing § 666's scope, in favor of a broad reading." *Keen*, 676 F.3d at 990.

In 1986, Congress added an exception to the statute: "This section does not apply to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business."  § 666(c).  The legislative history for subsection (c) is limited to a single comment: the statute was amended "to avoid its possible application to acceptable business practices."  H.R. Rep. No. 99-797, at 30 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 6138, 6153.

8

**B.**

The district court found Chafin guilty of federal-program embezzlement under 18 U.S.C. § 666(a)(1)(A).  We will affirm this conviction if the government presented evidence sufficient to prove that (1) Chafin was an agent of Brooks County; (2) Chafin embezzled or otherwise knowingly converted to his own use property owned by or under the care, custody, or control of Brooks County; (3) the embezzled or converted property had a value of $5000 or more; and (4) "during a continuous one-year period beginning no earlier than one year [before Chafin's unlawful] conduct and ending no later than one year after the conduct, [Brooks County] received in excess of $10,000 under a federal program involving federal assistance monies."  *Keen*, 676 F.3d at 989.

On appeal, Chafin challenges only the sufficiency of the evidence on the federal-funds threshold.  He contends that the government did not prove that Brooks County received more than $10,000 in nonexcepted federal funds during 2007 and 2008.  He supports this contention with two pillars: one legal and one factual.

Chafin's legal pillar rests on the bedrock statutory-interpretation principle: a statute's plain meaning controls absent ambiguous language or absurd results.  *See United States v. Carrell*, 252 F.3d 1193, 1198 (11th Cir. 2001).  Given this foundation, he builds his legal pillar out of the text of § 666(c), which provides that "[t]his section does not apply to bona fide salary . . . paid . . . in the usual course of business."  In his view, because the plain and unambiguous meaning of *this section* is "this section"—§ 666— subsection (c)'s bona fide salary exception applies to

9

the whole statute, including the federal-funds threshold.  He also concludes that this reading does not lead to absurd results, underscoring the Sixth Circuit's similar conclusion about the exception's plain meaning almost twenty years ago.  *See United States v. Mills*, 140 F.3d 630, 633 (6th Cir. 1998) ("[T]he bona fide salary exception of subsection (c) must be read to apply to all of § 666.").

Chafin's factual pillar is composed of two undisputed facts.  First, in each fiscal year 2007 and 2008, Brooks County received $33,997 in federal grants from the Office for Victims of Crime.  Second, each year Brooks County used at least $25,000 of these funds to pay the witness advocate's salary—the bona fides of which the government does not dispute.

Applying § 666(c)'s exception to § 666(b)'s federal-funds threshold, Chafin asserts that the witness advocate's salary is excepted from the federal grants Brooks County received.  Thus, he concludes, this court should vacate his federal-program embezzlement conviction because the government failed to prove that Brooks County received more than $10,000 in nonexcepted federal funds.

## C.

Chafin's appeal presents a statutory-interpretation question of first impression for this or any circuit: whether § 666(c)'s exception applies to § 666(b)'s federal-funds threshold.[4]

---

[4] Although the Sixth Circuit concluded that subsection (c)'s exception applies to the whole statute, it did so in a case involving a challenge to the so-called *transactional element* of § 666(a)(1)(B) and (a)(2); that is, whether a bribe was made or accepted "in connection with any business, transaction, or series of transactions . . . involving anything of value of $5,000 or more."  *See Mills*, 140 F.3d at 633 ("[T]he defendants focus their attacks solely upon the government's contention that the co-conspirators' receipt of the deputy sheriff jobs paying more

To answer this question, we begin with the statute's text.  That is because where the statutory language is clear and unambiguous, we "presume that Congress said what it meant and meant what it said." *United States v. Browne*, 505 F.3d 1229, 1250 (11th Cir. 2007) (quoting *United States v. Steele*, 147 F.3d 1316, 1318 (11th Cir. 1998) (en banc)).  Indeed, "[o]ur inquiry must cease if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'" *Med. Transp. Mgmt. v. Comm'r*, 506 F.3d 1364, 1368 (11th Cir. 2007) (quoting *Robinson v. Shell Oil, Co.*, 519 U.S. 337, 340, 117 S. Ct. 843, 846 (1997)).

To test for ambiguity, "we must examine the language of the statute, 'the specific context in which that language is used, and the broader context of the statute as a whole.'" *U.S. Steel Mining Co., v. Director, OWCP*, 719 F.3d 1275, 1281 (11th Cir. 2013) (quoting *Robinson*, 519 U.S. at 341, 117 S. Ct. at 846).  However, because the "meaning—or ambiguity—of certain words or phrases may only become evident when placed in context," we read them "in their context and with a view to their place in the overall statutory scheme." *King v. Burwell*, 576 U.S. ___, ___, 135 S. Ct. 2480, 2489 (2015) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132, 120 S. Ct. 1291, 1300–01 (2000)); *see also Deal v. United States*, 508 U.S. 129, 132, 113 S. Ct. 1993, 1996 (1993) (It is a "fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used.").  In the end, "[s]tatutory language is

---

than $5,000 per year establish that the transactions involved something valued at $5,000 or more.").

11

ambiguous if it is susceptible to more than one reasonable interpretation." *Med. Transp. Mgmt.*, 506 F.3d at 1368.

Here, although the government offers a number of prudential objections to Chafin's reading of § 666(c), it does not posit that the plain meaning of the phrase *this section* warrants applying subsection (c)'s exception to only certain parts of § 666. Nor does it contend that the legislative history justifies construing the exception's scope narrowly. At the same time, as the Supreme Court notes, "Congress ordinarily adheres to a hierarchical scheme in subdividing statutory sections." *Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50, 60, 125 S. Ct. 460, 467 (2004).

After considering the overall statutory scheme, we conclude that the phrase "[t]his section" in § 666(c) is unambiguous and that the statutory scheme is consistent and coherent. *Cf. Perry v. First Nat'l Bank*, 459 F.3d 816, 820 (7th Cir. 2006) (holding that the phrase *this section* in 15 U.S.C. § 1681m(h)(8) "unambiguously refers to [§] 1681m as a whole"). We thus hold that subsection (c)'s exception applies to subsection (b)'s federal-funds threshold. *Accord Mills*, 140 F.3d at 633 ("[T]he bona fide salary exception of subsection (c) must be read to apply to all of § 666."); *United States v. Nichols*, 40 F.3d 999, 1000 (9th Cir. 1994) (explaining that § 666(c) "excludes local agencies that receive federal funds only as 'bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business.'").[5]

---

[5] Other circuits have split over whether subsection (c)'s exception applies to the transactional element of a § 666 bribery charge. *Compare United States v. Robinson*, 663 F.3d 265, 270, 272 (7th Cir. 2011) (holding that § 666(c) does not "preclude[ ] the government's use

**D.**

Chafin contends that we should vacate his federal-program embezzlement conviction. Applying § 666(c) to § 666(b), he posits that the federal funds designated for payment of the victim advocate's salary do not count toward the federal-funds threshold. Thus, he concludes, excepting these funds, the government failed to prove that Brooks County received more than $10,000 in federal funds. We disagree and thus affirm his conviction.

**1.**

Having concluded that § 666(c) applies to the whole statute, we must determine what types of payments are excepted from § 666(b)'s federal-funds threshold. Again, we begin with the text. Subsection (c) excepts "bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business." Thus, for a salary to be excepted, it must not only be "bona fide" but also "paid . . . in the usual course of business." Subsection (b), on the other hand, limits the statute's reach to only those covered entities that received "benefits in excess of $10,000 under a Federal program" in a statutorily defined one-year period. *See* § 666(d)(5).

---

of salary evidence to establish the transactional element" of § 666(a)(1)(B) offense), *and United States v. Marmolejo*, 89 F.3d 1185, 1190 n.5 (5th Cir. 1996) (noting that § 666(c)'s exception "refers to the alleged wrongdoing, . . . not to the nature of the benefit that the agency receives pursuant to the Federal program"), *aff'd on other grounds sub nom. Salinas v. United States*, 522 U.S. 52, 118 S. Ct. 469 (1997), *with Mills*, 140 F.3d at 633 (holding that subsection (c)'s exception applies to the transactional element of a § 666 bribery offense).

Although we hold that § 666(c) covers the whole statute, we express no opinion about how the exception applies to the transactional element in subsections (a)(1)(B) and (a)(2).

When applied to § 666(b), we conclude that § 666(c)'s exception has more than one reasonable interpretation. For example, it could mean that a bona fide salary paid by the federal government in the usual course of business to a covered entity does not count toward the federal-funds threshold. Alternatively, it could mean that federal funds designated for the payment of a bona fide salary by a covered entity in the usual course of business do not count toward the federal-funds threshold. The meaning of subsection (c)'s exception for purposes of subsection (b) is thus ambiguous. *See Med. Transp. Mgmt.*, 506 F.3d at 1368.

To resolve this ambiguity, which remains despite examining the exception's plain language and its statutory context, we may consult the statute's legislative history. *United States v. Zuniga-Arteaga*, 681 F.3d 1220, 1223 (11th Cir. 2012); *see also United States v. Copeland*, 143 F.3d 1439, 1441 (11th Cir. 1998) ("In determining whether Lockheed falls within the scope of § 666(b), we must consider the statute's text, legislative history, and purpose.").

As already noted, the legislative history about the addition of subsection (c) is scant: a single comment stating that the statute was amended "to avoid its possible application to acceptable business practices." H.R. Rep. 99-797, at 30. This comment suggests that the exception serves two purposes. First, it reinforces the wall separating acceptable business practices and criminal conduct erected in the statute's text. Second, it plugs any "possible" gaps in the statutory text that might criminalize "acceptable business practices."[6] The exception's narrow, gap-

---

[6] Given the dearth of legislative history, we must be extra cautious in drawing inferences about congressional intent. That said, even if this comment permits an inference that Congress intended the exception to cover only certain parts of § 666, our conclusion that plain meaning

14

filling purpose thus stands in stark contrast to the statute's broad purpose—
"ensuring 'the integrity of organizations participating in federal assistance
programs.'"  *Keen*, 676 F.3d at 990 (quoting *Fischer v. United States*, 529 U.S.
667, 678, 120 S. Ct. 1780, 1787 (2000)).  Despite the statute's broad purpose, the
legislative history implies that § 666 was not intended to reach "every Federal
contract or disbursement of funds" of more than $10,000.  S. Rep. No. 98-225, at
370.  Even so, we have noted that the Supreme Court has repeatedly rejected
"statutory constructions aimed at narrowing § 666's scope, in favor of a broad
reading" based on the statute's "ambitious objective."  *Keen*, 676 F.3d at 990.

After reviewing § 666's legislative history, we conclude that as applied to
§ 666(b) only one interpretation of § 666(c) reflects the statute's "ambitious
objective" and the exception's gap-filling role.  For this reason, we resolve the
ambiguity in favor of this interpretation and hold that subsection (b)'s federal-
funds threshold is satisfied only if during the statutory period a covered entity
receives more than $10,000 in "benefits . . . under a Federal program" after
excepting any "bona fide salary, wages, fees, or other compensation paid, or
expenses paid or reimbursed" to that entity by the federal government in the usual
course of business.

---

renders subsection (c) applicable to the whole statute would remain unscathed.  *See Lowery v.
Ala. Power Co.*, 483 F.3d 1184, 1205 (11th Cir. 2007) (concluding that "it is error to cloud the
plain meaning of a statutory provision with contrary legislative history").

15

**2.**

While we agree with Chafin's conclusion that § 666(c) applies to § 666(b), we disagree with his contention that the victim advocate's bona fide salary is excepted from the federal benefits Brooks County received. At trial, the government proved that in calendar years 2007 and 2008 Brooks County received more than $10,000 in federal funds from grants through the Office for Victims of Crime. These grants were intended to cover some of the personnel and operating costs associated with the witness-advocate position in the sheriff's office, including the witness advocate's salary. However, while these grants provided the county with federal funds to pay the witness advocate's salary, these funds were not salary payments from the federal government to Brooks County. Thus, the funds that paid the witness advocate's salary are not excepted when calculating the federal-program benefits Brooks County received for § 666(b) purposes.[7]

Accordingly, we conclude from the record that the government presented sufficient evidence to prove that Brooks County received more than $10,000 in federal funds during both 2007 and 2008. Because Chafin did not challenge the sufficiency of proof on any other element, we affirm his conviction for federal-program embezzlement.

---

[7] The district court concluded that § 666(c) does not apply to § 666(b) and thus did not except the witness advocate's salary from the federal funds Brooks County received. While the district court's interpretation of § 666(c) was error, this error was harmless because, like the district court, we conclude that the witness advocate's salary is not excepted for purposes of § 666(b).

## IV.

The district court found that Chafin's statements to GBI Agent Callahan, a state law enforcement officer, violated 18 U.S.C. § 1512(b)(3), which criminalizes misleading statements to federal officials about a possible federal offense.[8]  To do so, the district court relied on our decision in *United States v. Veal*, 153 F.3d 1233 (11th Cir. 1998).  There, we held that this provision "does not require that a defendant know the federal nature of the crime about which he provides information because the statute criminalizes the *transfer* of misleading information which actually relates to a *potential* federal offense."  *Id.* at 1252.  We explained that this provision negates a specific intent mens rea.  And we added that "[i]t is irrelevant to [our] inquiry whether the person who provides false or misleading information that ultimately becomes relevant to a federal investigation *intended* that a federal investigator or judge receive that information; it is relevant only that a federal investigator or judge *received* it."  *Id.*

In April 2010, a month before Chafin's trial, we extended *Veal*'s reasoning, concluding that "the *possible* or *potential* communication to federal authorities of a possible federal crime is sufficient for purposes of [§] 1512(a)(1)(C)."  *United States v. Fowler*, 603 F.3d 883, 888 (11th Cir. 2010).  After Chafin's trial but before the district court found him guilty and sentenced him, the Supreme Court granted Fowler's petition for writ of certiorari and reversed, rejecting our

---

[8] Specifically, § 1512(b)(3) makes it a crime for anyone to "engage[ ] in misleading conduct toward another person, with intent to . . . hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense."

17

previously enunciated possibility standard. *Fowler v. United States*, 563 U.S. ___, ___, 131 S. Ct. 2045, 2053 (2011). The Court held that to support a conviction under § 1512, "the Government must show that there was a *reasonable likelihood* that a relevant communication would have been made to a federal officer." *Id.* at ___, 131 S. Ct. at 2048; *see also id.* at ___, 131 S. Ct. at 2052 ("We consequently hold that (in a case such as this one where the defendant does not have particular federal law enforcement officers in mind) the Government must show *a reasonable likelihood* that, had, *e.g.*, the victim communicated with law enforcement officers, at least one relevant communication would have been made to a federal law enforcement officer.").

On appeal, Chafin asserts for the first time that the district court erred by analyzing the evidence under *Veal*'s possibility standard. Because he did not object below, we review for plain error only. *See Rodriguez*, 751 F.3d at 1251. And while this standard of review erects a series of hurdles to appellate relief, we conclude that Chafin easily clears them and thus we vacate his § 1512(b)(3) conviction.

First, the district court should have analyzed the evidence under *Fowler*'s reasonable likelihood standard. In this circuit, a prior panel opinion can be disregarded only if its "holding is overruled by the Court sitting en banc or by the Supreme Court." *United States v. Kaley*, 579 F.3d 1246, 1255 (11th Cir. 2009) (quoting *Smith v. GTE Corp.*, 236 F.3d 1292, 1300 n.8 (11th Cir. 2001)). For a Supreme Court decision to "overrule" a prior panel precedent, "the intervening Supreme Court case [must] actually abrogate or directly conflict with, as opposed

to merely weaken, the holding of the prior panel." *Id.* *Fowler* did precisely that to our holding in *Veal*. *See Fowler*, 563 U.S. at \_\_\_, \_\_\_, 131 S. Ct. at 2048, 2052. Indeed, the government does not contend otherwise. We thus conclude that the district court's use of *Veal*'s standard was reversible error.

Second, the district court's error is plain on appellate review. This is enough for purposes of plain-error review. *See Henderson*, 568 U.S. \_\_\_, 133 S. Ct. at 1130–31.

Third, the district court affected Chafin's substantial rights by analyzing the evidence under *Veal*'s standard. At trial, the government introduced no evidence showing that Chafin's statements to the GBI agent investigating the alleged misuse of the jail commissary account were reasonably likely to be communicated to federal authorities. Just the opposite. The government proved that the GBI agent told Chafin that the local district attorney had initiated the investigation. So had the district court applied *Fowler*'s standard to the evidence, Chafin's trial on the § 1512(b)(3) charge would have ended in an acquittal instead of a conviction. We thus conclude that the district court's error affected Chafin's substantial rights. *See Beckles*, 565 F.3d at 844.

Fourth, and finally, if allowed to stand, the district court's error would seriously affect the fairness , integrity, and public reputation of judicial proceedings. We may thus exercise our discretion to notice this forfeited error and correct it. *See Rodriguez*, 398 F.3d at 1299.

Because we conclude that Chafin clears all four hurdles to appellate relief under plain-error review, we vacate his § 1512(b)(3) conviction.

19

## V.

In conclusion, we affirm Chafin's embezzlement conviction under 18 U.S.C. § 666(b) because the exception in § 666(c) does not reach the witness advocate's salary.  We vacate Chafin's conviction under 18 U.S.C. § 1512(b)(3) and remand the case to the district court for further proceedings because the district court plainly erred in applying this circuit's now-rejected possibility standard rather than the Supreme Court's reasonable likelihood standard.  Based on the trial evidence, the government did not meet its burden of proving that there was a reasonable likelihood that Chafin's misleading information about a potential federal offense would be communicated to federal authorities.

AFFIRMED in part, VACATED in part, and REMANDED.