[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-14689

_____

D.C. Docket No. 9:11-cr-80106-KAM-17

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JOEL ANTONIO SIMON RAMIREZ,

Defendant,

KENNETH KAROW,
HERMANN J. DIEHL,
HAL MARK KREITMAN,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(January 31, 2018)

Before WILLIAM PRYOR, MARTIN, and BOGGS,[*] Circuit Judges.

MARTIN, Circuit Judge:

The opinion issued yesterday in this case is VACATED, and this one is issued in its stead.  The only change made is in Section VII of the opinion, related to the restitution portion of Mr. Kreitman's sentence.

Kenneth Karow, Hermann Diehl, and Hal Kreitman appeal their convictions and sentences imposed after a jury found them guilty of mail fraud; conspiracy to commit mail fraud; money laundering; and conspiracy to commit money laundering.  After careful consideration, and with the benefit of oral argument, we affirm Mr. Karow's and Mr. Diehl's convictions and sentences.  We also affirm Mr. Kreitman's convictions but vacate his sentence and remand for further proceedings.

## I.  BACKGROUND

Florida law requires all car insurance policies to include personal injury ("PIP") coverage.  See Fla. Stat. § 627.730 et seq.  Each car insurance policy has a minimum of $10,000 of PIP coverage per person involved in an accident, regardless of fault.  See id. § 627.736(1).  After the insured person has paid his co-pay and deductible, the PIP coverage pays 80% of all reasonably necessary medical expenses, subject to certain conditions.  See id. § 627.736(1)(a).

---

[*] Honorable Danny J. Boggs, United States Circuit Judge for the Sixth Circuit, sitting by designation.

A group of friends from Pinar del Rio, Cuba, all living in South Florida, wanted to take advantage of Florida's PIP coverage. They opened several clinics in South Florida, beginning in October 2006. These clinics intentionally maximized patients' medical expenses to the mandatory PIP coverage amount. Patients were recruited for the scheme in two ways. Sometimes, the conspirators found people who had been involved in legitimate car accidents. Other times, they used recruiters who found people to stage accidents. The recruiters and the participants in the staged accidents would get kickbacks for their work. The pay varied, depending on how many passengers were in the staged accident, because PIP coverage is per person. The pay also varied based on which insurance company insured the participant, because certain companies paid out claims faster and more easily than others. The average rate for recruiting two participants in an accident was $4,500. The drivers in these "accidents" would agree in advance on where and how to get in an accident. Sometimes they damaged the cars in advance. For example, an informant for the FBI videotaped one of these stagings. In this video, a recruiter used a sledgehammer on the participants' cars in a parking lot. Then, the participants drove onto the road, stopped their cars, and called the police to report the "accident."

Regardless of whether a recruited participant was in a real or staged accident, after the accident the recruit would go to one of the clinics in the scheme

3

to become a patient.  At the clinic, the participants were coached on what to say to the clinic's chiropractor and the insurance company.  They would then see a chiropractor who routinely prescribed 35 to 40 therapy sessions to cure their injuries.  This was just about the number of sessions needed to maximize the PIP coverage of each patient.  Patients also pre-signed a number of therapy session forms so the clinic could bill claims for several sessions without actually seeing the patient again.  These "patients" were instructed to tell their insurance companies that the clinic collected copays and deductibles that were never actually collected and that each therapy session lasted over an hour, which they hadn't.

Mr. Karow, Mr. Diehl, and Mr. Kreitman were all chiropractors involved in this scheme.  Mr. Karow's and Mr. Diehl's roles in the scheme, however, grew in light of some provisions of Florida law.  Florida regulates health care clinics in the state through the Florida Agency for Health Care Administration ("AHCA").  Fla. Stat. § 400.9905.  Generally, health care clinics are required to have a license from the AHCA in order to bill insurance companies.  The licensing process is quite extensive, and requires inspections and background checks for the owner, medical director, financial officer, all medical practitioners, and anyone who has contact with clients or client funds.  It also requires any "nonimmigrant aliens" with an ownership interest in the clinic to file a surety bond of at least $500,000.  Id. § 408.8065(2).  This requirement for a license does not apply to health care clinics

4

"wholly owned" by a licensed chiropractor.  Id. § 400.9905(4)(g).  These "wholly owned" health care clinics can get a "certificate of exemption" from the AHCA.

On October 1, 2007, Florida updated its PIP statutes.  Compare Fla Stat. §§ 627.736, 627.739 (2007), with id. §§ 627.736, 627.739 (2008).  Among other things, Florida law imposed a requirement that health care clinics be licensed continuously for three years before they were allowed to bill insurance companies for reimbursement under the PIP coverage.  Id. § 627.736(1)(a).  But the law again provided for an exception for health care clinics "wholly owned" by a licensed chiropractor.  Id.  Because of this legal framework under Florida law, the leaders of the scheme looked for chiropractors to serve as "straw owners" for their clinics.

Mr. Karow was the straw owner for Florida Therapy & Rehab Center, Franco Chiropractor Center, and New York Medical & Rehab Center.  He also owned and operated his own clinic, the Karow Chiropractic Center.  He allowed two of the scheme's leaders to run a "back clinic" out of the Karow Chiropractic Center's office space, but with a separate entrance, staff, and bank account.  The "back clinic" served primarily Spanish-speaking clients.  Over time, the scheme's leaders became suspicious of Mr. Karow, fearing he was stealing money from the back clinic's reimbursements.  For that reason, they closed the back clinic as well as New York Medical & Rehab Center.  They then opened Florida Mango Massage Therapy Center in the same building where New York Medical had been

5

and set up a new arrangement with Mr. Karow.  They sent accident participants to Mr. Karow at Karow Chiropractic Center to be prescribed therapy at Florida Mango.  Mr. Karow billed for the evaluation, and Florida Mango billed for the prescribed therapies.

Mr. Diehl was the straw owner for Febre's Medical Center and 36 Rehabilitation Center.  He signed a fraudulent bill of sale saying he paid $200 to purchase Febre's.  The AHCA documentation for Febre's, signed by Mr. Diehl, said he was an "owner[] of a financial interest . . . and supervise[d] the business activities and is legally responsible for . . . compliance with all federal and state laws."  And he signed AHCA documentation for 36 Rehab with the same language.  In February 2009, Mr. Diehl signed another fraudulent bill of sale saying he sold both Febre's and 36 Rehabilitation to another codefendant who is not part of this appeal.

Mr. Kreitman was not a straw owner.  He first worked as an independent contractor for AllCare Consultants, which is a company that provides chiropractic staffing and placement services.  AllCare placed him at three clinics that played a part in the scheme: Universal Rehabilitation, 36 Rehabilitation, and Elite Rehabilitation.  After some time, he also began working directly for the owner of Progressive Rehabilitation, who was yet another codefendant in this scheme, but is not part of this appeal.

After a 24-day trial, the jury convicted Mr. Karow and Mr. Kreitman on all counts, and Mr. Diehl on all but one count. Mr. Karow was convicted of 1 count of conspiracy to commit mail fraud, 48 counts of mail fraud, 1 count of conspiracy to commit money laundering, and 11 counts of money laundering. He was sentenced to 132-months imprisonment and 2 years of supervised release, and ordered to pay $6,640,354.07 in restitution and an assessment of $6,100.

Mr. Diehl was convicted of 1 count of conspiracy to commit mail fraud, 2 counts of mail fraud, 1 count of conspiracy to commit money laundering, and 3 counts of money laundering. He was sentenced to 108-months imprisonment and 2 years of supervised release, and ordered to pay $1,685,345.01 in restitution and an assessment of $700.

Mr. Kreitman was convicted of 1 count of conspiracy to commit mail fraud, 21 counts of mail fraud, 1 count of conspiracy to commit money laundering, and 2 counts of money laundering. He was sentenced to 96-months imprisonment and 2 years of supervised release, and ordered to pay $1,634,195.83 in restitution and an assessment of $2,500.

## II.  SUFFICIENCY OF THE EVIDENCE

All three defendants challenge the sufficiency of the evidence for their convictions. "We review both a challenge to the sufficiency of the evidence and the denial of a Rule 29 motion for judgment of acquittal de novo." United States v.

Chafin, 808 F.3d 1263, 1268 (11th Cir. 2015) (quotation omitted).  "We examine the evidence in the light most favorable to the government and resolve all reasonable inferences and credibility issues in favor of the guilty verdicts."  Id. (quotation omitted and alteration adopted).  This Court will not overturn a guilty verdict nor disturb the denial of a Rule 29 motion unless no reasonable trier of fact could find guilt beyond a reasonable doubt.  Id.

## A.  MAIL FRAUD

To prove a conspiracy to commit mail fraud under 18 U.S.C. § 1349, the government must prove beyond a reasonable doubt "(1) that a conspiracy [to commit mail fraud] existed; (2) that the defendant knew of it; and (3) that the defendant, with knowledge, voluntarily joined it."  United States v. Vernon, 723 F.3d 1234, 1273 (11th Cir. 2013) (quotation omitted).  For the substantive mail fraud charges under 18 U.S.C. § 1341, the government must prove beyond a reasonable doubt: "(1) an intentional participation in a scheme to defraud a person of money or property, and (2) the use of the mails in furtherance of the scheme."  United States v. Hill, 643 F.3d 807, 858 (11th Cir. 2011) (quotation omitted).

All three defendants challenge the knowledge and intent elements of their mail fraud and conspiracy to commit mail fraud convictions.  Mr. Karow says "he was an honest doctor" and that the only witness who directly linked him to the conspiracy was one of his patients, Wilfredo Sauceda.  Mr. Sauceda testified that

8

Mr. Karow told him where his pain was located, and that he had been told that Mr. Karow was in on the conspiracy. Mr. Karow argues that Mr. Sauceda's testimony alone was not enough to find him guilty of conspiracy to commit mail fraud. But Mr. Sauceda's testimony was not the only evidence the government presented against Mr. Karow. Among other things, the government presented evidence that Mr. Karow signed examination forms and prescribed therapies for patients he never saw. A massage therapist who worked for Mr. Karow testified that Mr. Karow gave him $6,000 to pay recruited patients. And his secretary participated in two staged accidents and performed patient examinations that Mr. Karow later signed as having performed himself. Under this Court's precedent, knowledge of a conspiracy as well as intent to commit mail fraud can be inferred from circumstantial evidence of a scheme and the defendant's conduct. United States v. Bradley, 644 F.3d 1213, 1239 (11th Cir. 2011); United States v. Molina, 443 F.3d 824, 828 (11th Cir. 2006). On this record, we cannot say "no reasonable trier of fact could find guilt beyond a reasonable doubt." Chafin, 808 F.3d at 1268 (quotation omitted).

Mr. Diehl says he was an unwitting participant in this scheme. He argues that his patient files show, contrary to the government's assertions, that he did not order standard courses of treatments for patients that were designed to maximize PIP payments. Nevertheless, the government presented evidence that Mr. Diehl

9

admitted to an FBI agent that he had filled out therapy prescriptions designed to "max [the PIP]," backdated forms, and routinely saw patients for only five minutes. Mr. Diehl also admitted to the agent that prescribing approximately 28 to 36 therapy sessions was "standard protocol" and that "he considered [backdating] to be fraud." Mr. Diehl said "he felt it was obvious that patients were just signing for therapy and were not receiving [it]" and knew "there was no way the clinic could handle the volume of therapies that were being prescribed." Although Mr. Diehl disputes the testimony of the FBI agent about his statements, the jury was free to make its own credibility determinations and draw reasonable conclusions from the evidence presented. United States v. Garcia, 447 F.3d 1327, 1334 (11th Cir. 2006). On this record, we cannot say "no reasonable trier of fact" could conclude Mr. Diehl knew about the conspiracy and intentionally participated in the scheme. See Chafin, 808 F.3d at 1268 (quotation omitted).[1]

Mr. Kreitman also says he was an unknowing participant. He claims that he worked at the fake clinics only because he was assigned to them by AllCare, and that he never actually knew a conspiracy was going on. He also argues that while any forms he signed without seeing patients, the similarities in treatment plans, and his statements to law enforcement agents may be suspicious, such evidence fails to

---

[1] Because we affirm on this theory of the government's case, we need not and do not address Mr. Diehl's argument about the government's alternative theory of the case, that his convictions cannot stand because the Florida statutes the government alleged he violated are constitutionally void for vagueness or should be interpreted using the rule of lenity.

show that he knowingly participated in the conspiracy. But again, the government presented additional evidence that would allow a reasonable factfinder to conclude otherwise. The jury was shown photographs of Mr. Kreitman going into Elite Rehab and leaving after one hour and ten minutes. One-half hour after he left, a patient went in. Despite Mr. Kreitman and the patient not being there at the same time, Mr. Kreitman signed an examination form and prescribed treatment for the patient that was billed to AllState. Mr. Kreitman also admitted to an FBI agent that he thought patients were being coached and paid. He told the agent that he followed a "standard prescription" for all patients aimed at "trying to maximize the $10,000 PIP limit." He described things to the agent as "not on the up and up." On this record, we cannot say "no reasonable trier of fact" could conclude Mr. Kreitman knew of and intentionally participated in the scheme. See Chafin, 808 F.3d at 1268 (quotation omitted).

The evidence was sufficient to support a jury finding that all three defendants had knowledge of the mail fraud conspiracy and intentionally participated in both it and the substantive mail fraud scheme. And the government presented evidence that claim documentation in the conspiracy was frequently sent to insurance providers through the U.S. mail. Our precedent provides that "[p]roof of a routine practice of using the mail to accomplish a business end is sufficient to support a jury's determination that mailing occurred in a particular instance."

11

United States v. Waymer, 55 F.3d 564, 571 (11th Cir. 1995).  Viewing the evidence in the light most favorable to the government, we affirm the mail fraud and conspiracy to commit mail fraud convictions of all three defendants.

B.  MONEY LAUNDERING

To prove a conspiracy to commit money laundering under 18 U.S.C. § 1956(h), the government must prove: "(1) agreement between two or more persons to commit a money-laundering offense; and (2) knowing and voluntary participation in that agreement by the defendant." United States v. Broughton, 689 F.3d 1260, 1280 (11th Cir. 2012).  The underlying money laundering offenses were charged in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), 1956(a)(1)(B)(i), and 1956(a)(1)(B)(ii).  To prove money laundering, the government must show the defendant (1) engaged in a financial transaction that (2) he knew involved funds that were the proceeds of some unlawful activity, and (3) those funds were in fact the proceeds of that unlawful activity.  See 18 U.S.C. § 1956(a).  Here, the unlawful activity is mail fraud.  In addition to these three requirements, the government is required to show either: (1) the defendant intended to promote the carrying on of the unlawful activity, see id. § 1956(a)(1)(A)(i); (2) the defendant knew the transaction was designed to conceal the nature of the proceeds of the unlawful activity, see id. § 1956(a)(1)(B)(i); or (3) the defendant knew the transaction was designed to avoid a state or federal reporting requirement, see id.

12

§ 1956(a)(1)(B)(ii).  These three types of money laundering are called promotion money laundering, concealment money laundering, and structuring transactions, respectively.

The evidence was sufficient to support a jury finding that all three defendants conspired to commit money laundering.  In United States v. Azmat, 805 F.3d 1018 (11th Cir. 2015), we upheld a conviction for conspiracy to commit promotion money laundering under facts similar to those offered at trial here.  In that case involving a "pill mill" scheme, we concluded that trial testimony permitted the jury to infer that Azmat's codefendants agreed to dispense controlled substances for cash, which was then used to support further activities of the "pill mill."  Id. at 1037–38.  We also concluded that sufficient evidence had been presented for the jury to find that Azmat had knowingly and voluntarily participated in that agreement.  Azmat knew patients paid the clinic in cash and received his salary in cash.  Although Azmat "may not have been aware of all of the uses of the clinic's proceeds, it was reasonable for the jury to infer that he knew that the cash was used to pay salaries and cover the clinic's operating costs."  Id. at 1038.  We also found it reasonable for the jury to conclude that, because Azmat had already agreed "to dispense medications outside the course of his usual professional practice[,] . . . and by continuing to work and generate profits, Dr.

13

Azmat had knowingly joined a conspiracy to launder money, in which illegal proceeds were used to 'promote' [the clinic]'s drug-dispensing activities." Id.

As in Azmat, the evidence introduced in the District Court would permit a jury to determine that various individuals at the center of the conspiracy, including Luis Ivan Hernandez, Maria Testa, Lazaro Vigoa Mauri, and Vladimir Lopez, agreed to submit fraudulent insurance reimbursement claims and use that money to pay the participants in the scheme, fund clinics, and pay the salaries of the employees at the clinics where the chiropractors worked. The trial evidence was also sufficient to permit a jury to find that Mr. Karow, Mr. Diehl, and Mr. Kreitman knew that their salaries, as well as the expenses of the clinics, were funded with the fraudulent insurance proceeds. Because all three codefendants continued to work and generate profits knowing that fraudulent insurance proceeds were being used to pay their salaries and clinic expenses, the jury could determine that all three had joined the conspiracy to commit money laundering. See id.

Because the evidence was sufficient to establish that the chiropractors participated in a conspiracy to commit promotion money laundering, the jury could also find the chiropractors guilty of all of the substantive counts of money laundering under the rule of coconspirator liability established by Pinkerton v. United States, 328 U.S. 640, 66 S. Ct. 1180 (1946). "Under Pinkerton, each member of a conspiracy is criminally liable for any crime committed by a

coconspirator during the course and in furtherance of the conspiracy, unless the crime did not fall within the scope of the unlawful project, or was merely a part of the ramifications of the plan which could not be reasonably foreseen as a necessary or natural consequence of the unlawful agreement." United States v. Alvarez, 755 F.2d 830, 847 (11th Cir. 1985) (quotation omitted).  In other words, a coconspirator is liable for "all of the acts and foreseeable consequences of the conspiracy." United States v. Silvestri, 409 F.3d 1311, 1335 (11th Cir. 2005) (emphasis and quotation omitted).  This doctrine "has been applied to money laundering conspiracy cases; a defendant who joins a money laundering conspiracy may be found substantively liable for money laundering offenses committed by co-conspirators." Id. at 1336.

Under this theory, the evidence was sufficient to support a jury verdict for the substantive money laundering counts involving paychecks written to Mr. Karow, Mr. Diehl, and Mr. Kreitman.  Evidence was introduced to establish that the leaders of the conspiracy wrote the paychecks to ensure the chiropractors would continue to serve as "owners" of the clinic, show up to work, and write fraudulent prescriptions.  Such payments were within the scope of the conspiracy to commit money laundering because they paid the expenses of the clinics,

15

including the salaries of the employees, and thus, were designed to promote the carrying on of the mail fraud scheme.[2]

We also affirm the substantive money laundering counts that did not involve paychecks to the three codefendants. Mr. Karow's conviction for count 112 involved a check payable to Dagoberto Milian drawn on the New York Medical checking account, signed by Vladimir Lopez. Evidence established that Mr. Milian was a recruiter paid to bring in patients to the clinics and that he staged accidents and participated in an accident himself. From this evidence, a reasonable factfinder could infer that Mr. Milian was paid for his participation in the conspiracy, with the intent to encourage him to continue participating in it and to bring more patients into the clinics. Such a payment would be within the scope of the conspiracy to commit promotion money laundering.

---

[2] We asked for supplemental briefing on the question of whether there was sufficient evidence to support the convictions for counts 80–83 in light of the Supreme Court's decision in United States v. Santos, 553 U.S. 507, 128 S. Ct. 2020 (2008). In that case, a plurality of the Supreme Court held that "proceeds" in the money laundering statute should be read to mean "profits" not "receipts." Id. at 514, 128 S. Ct. at 2025. Applying this definition would mean that the payment of salaries and other essential expenses would not be sufficient to support a conviction for money laundering. The year after Santos was decided, Congress amended the money laundering statute to define "proceeds" as "gross receipts," effectively superseding the interpretation in Santos. Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, § 2, 123 Stat. 1617, 1618 (codified at 18 U.S.C. § 1956(c)(9)). Counts 80–83 were based on conduct that occurred between when Santos was decided and when the statute was amended. However, prior panels of this Court have held that the narrower definition of "proceeds" set out in Santos should only be applied to conduct relating to unlicensed gambling operations that took place between when Santos was issued and the statute was amended. See United States v. Jennings, 599 F.3d 1241, 1252 (11th Cir. 2010); United States v. Demarest, 570 F.3d 1232, 1242 (11th Cir. 2009). Because our prior precedent requires us to confine Santos to the unlicensed gambling context, we apply the broader definition of "proceeds" to this case, which includes the payment of salaries. We therefore affirm counts 80–83 under the logic set out above.

16

The evidence was also sufficient to support Mr. Karow's convictions on counts 87 and 96.  Both counts involved checks for $9,000, payable to Maykel Marquez, Vladimir Lopez's brother in law.  Count 87 involved a check drawn on the New York Medical account, and count 96 involved a check drawn on the account for the "back clinic" at Karow Chiropractic Center.  Mr. Karow was a signatory on both accounts but did not sign either check.  Testimony established that Mr. Marquez would cash checks for Mr. Lopez, and that the check that formed the basis of count 87 was a check cashed on behalf of Mr. Lopez.  Testimony also established that at least once Mr. Marquez was paid for his participation in a staged accident, but that the check in count 87 was not related to that activity.  Both Mr. Marquez and Mr. Lopez were involved in the underlying conspiracy, and sufficient evidence was presented to allow the jury to find that the payments were made to compensate either or both of them for their participation in the scheme and to encourage them to continue participating.  Because Mr. Karow is liable for all of the acts and foreseeable consequences of the conspiracy, there was sufficient evidence to support his convictions under these counts.  Silvestri, 409 F.3d at 1335. We therefore affirm the codefendants' convictions on all of the money laundering counts.

### III.  JURY INSTRUCTIONS

We review for an abuse of discretion the District Court's refusal to give a requested jury instruction.  United States v. Tokars, 95 F.3d 1520, 1531 (11th Cir. 1996).  This Court will reverse a conviction for the failure to give a requested jury instruction only where the instruction: "(1) was correct, (2) was not substantially covered by a charge actually given, and (3) dealt with some point in the trial so important that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense."  United States v. Dohan, 508 F.3d 989, 993 (11th Cir. 2007) (per curiam) (quotation omitted).

Three of Mr. Karow's requested jury instructions were refused by the District Court.  The first was a "theory of defense" instruction.  Mr. Karow's proposed instruction on his theory of defense emphasized the requirements that the jury find "he knowingly and voluntarily participated in fraudulent conduct."  His proffered instruction also said that "being a bad business manager" or "being a joint signatory on a bank account" could not alone support the charges.  Although the District Court did not give Mr. Karow's requested charge verbatim, it included several instructions that expressly required the jury to find knowledge and voluntary participation.  We agree with the District Court that these other instructions substantially covered Mr. Karow's requested instruction.

18

Mr. Karow's second requested instruction was a modified pattern instruction about the "spillover effect" of codefendants' statements.  Mr. Karow asked the District Court to add a clause to the standard Eleventh Circuit jury instruction.  Mr. Karow asked that the court say: "Any such [codefendant] statement is not evidence about any other Defendant and cannot be used by you to infer knowledge or intent of any other Defendant."  The District Court instead said: "Any such statement is not evidence about any other defendant."  We conclude that the given instruction substantially covered Mr. Karow's proposed instruction here as well.

Mr. Karow's third request was for a "failure to record interviews" instruction.  This instruction pointed out that the FBI testimony about Mr. Karow's statements was based on the FBI agents' recollections, as it is FBI policy not to record interviews.  The requested instruction told the jury to be cautious with this testimony as a result of this failure to record.  The District Court instead instructed the jury to consider all the evidence cautiously, including "the circumstances under which it was made."  We are aware of no legal requirement, nor has Mr. Karow shown us one, that the FBI must record its interviews.  Rather, it is the role of the jury to weigh the credibility of witnesses on the basis of their testimony.  The District Court's instruction substantially covered Mr. Karow's requested instruction.  And in any event, we conclude the failure to give Mr. Karow's requested instruction did not seriously impair his ability to conduct his defense.

19

The District Court did not abuse its discretion with regard to these jury charges. See Tokars, 95 F.3d at 1531.

## IV.  EVIDENTIARY CHALLENGE

We review for an abuse of discretion the District Court's decision to admit evidence under Federal Rule of Evidence 404(b).  United States v. Phaknikone, 605 F.3d 1099, 1107 (11th Cir. 2010).  Whether the District Court abused its discretion in admitting evidence of a prior bad act under Rule 404(b) is evaluated with a three-part test:

> First, the evidence must be relevant to an issue other than the defendant's character.  Second, as part of the relevance analysis, there must be sufficient proof so that a jury could find that the defendant committed the extrinsic act. Third, the probative value of the evidence must not be substantially outweighed by its undue prejudice, and the evidence must meet the other requirements of Rule 403.

Id. (quotations and citations omitted).  Rule 404(b) allows evidence of a defendant's prior bad acts to show "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Fed. R. Evid. 404(b)(2).

Mr. Diehl challenges the testimony of one of the government's witnesses, Yoandra Marrero.  Over Mr. Diehl's objection, Ms. Marrero testified about Christ Medical, a clinic she owned that was not named in the indictment.  In addition to the clinics in this case, Mr. Diehl also worked at Christ Medical.  Christ Medical employed an insurance fraud scheme similar to the one in this case, where patients

20

visited the clinic only a handful of times, but insurance companies were billed for many more visits.  The government introduced evidence that Mr. Diehl worked at Christ Medical and told Ms. Marrero he would pay her $1,000 for each clinic she referred him to.  Ms. Marrero said she referred Mr. Diehl to several clinics.  She also testified that she taught Mr. Diehl how to run insurance fraud schemes.  Specifically, she told him how to schedule billing to minimize the chance of investigation and to list injuries to the extremities to maximize the rate at which PIP would be exhausted.  At Mr. Diehl's request, however, the District Court did read a limiting instruction about this testimony.

Mr. Diehl argues this testimony was not relevant to this case and inadmissible under Rule 404(b).  But applying our test from Phaknikone, we conclude that the District Court did not abuse its discretion.  First, this evidence was relevant to an issue other than Mr. Diehl's character: his intent and knowledge.  See Phaknikone, 605 F.3d at 1107; see also Fed. R. Evid. 404(b)(2).  Indeed as we have discussed, the government was required to prove knowledge and intent for all of his charged offenses.  Second, although Mr. Diehl concedes that witness testimony can be sufficient to show the existence of a prior act, he disputes that the record evidence does so.  However, we conclude that Ms. Marrero's testimony was itself sufficient proof that Mr. Diehl committed the "extrinsic acts."  Third, the probative value of this evidence outweighed any "undue prejudice."  See

21

Phaknikone, 605 F.3d at 1107 (quotation omitted).  Mr. Diehl's knowledge and intent were key issues at trial, and this evidence spoke to those issues.  The proof this testimony offered outweighed any "undue" prejudice to Mr. Diehl from the jury learning he had been involved in a similar scheme before.  Considering the "overall similarity between the extrinsic act and the charged offense," as well as the District Court's limiting instruction, we cannot say the District Court abused its discretion.  See United States v. Jernigan, 341 F.3d 1273, 1282 (11th Cir. 2003) (quotation omitted).

## V.  MOTION TO SUPPRESS

The District Court's denial of a motion to suppress involves mixed questions of fact and law.  We review de novo the District Court's legal conclusions and its findings of fact for clear error.  United States v. Hollis, 780 F.3d 1064, 1068 (11th Cir. 2015).  We review the entire record in the light most favorable to the prevailing party.  Id.  The voluntariness of a confession is a question of law, so it is subject to de novo review.  Hubbard v. Haley, 317 F.3d 1245, 1252 (11th Cir. 2003).  We evaluate voluntariness under the totality of the circumstances.  Id.

Mr. Kreitman argues the District Court erred when it denied his motion to suppress statements he made to federal agents.  He says the circumstances under which he made his statements rendered them involuntary.  In 2005 and 2011, Mr. Kreitman worked as a cooperating witness for the FBI in investigations into

steroids and MDMA.  Mr. Kreitman was not granted immunity for his assistance in these investigations.  But neither was he charged with any crime as a result of the investigations and, in fact, the DEA paid him for his help.  While working with the FBI in 2011, Mr. Kreitman said he was interested in assisting the FBI with health care fraud investigations.  In 2013, FBI agents contacted Mr. Kreitman about this case.  They set up a meeting where he told them about his involvement in the clinics.  The FBI then set up a second meeting, during which Mr. Kreitman requested immunity and, to his surprise, was denied.  Mr. Kreitman argues his previous work with the government led him to believe he would not be prosecuted for assisting with this case.  In other words, he argues the FBI made him an "implied promise."

A confession is voluntary if "it is the product of the defendant's free and rational choice."  Harris v. Dugger, 874 F.2d 756, 761 (11th Cir. 1989).  It may "not be extracted by any sort of threats or violence, or obtained by any direct or implied promises, or by the exertion of any improper influence."  Id.  We have said that "even a mild promise of leniency" can "undermine[] the voluntariness of a confession."  United States v. Lall, 607 F.3d 1277, 1285 (11th Cir. 2010) (quotation omitted).  Our review of the record, however, shows no promises or assurances were made to Mr. Kreitman that he would not be prosecuted.  He acknowledges as much.  Neither does our review of the record show any "implied"

23

promises.  Had the FBI agents explicitly lied to Mr. Kreitman, misrepresented their authority, or given any indication (however slight) that he was safe from prosecution, then the result here might be different.  But on this record, we agree with the District Court that, based on the totality of the circumstances, Mr. Kreitman's statements were voluntary.

## VI.  GUIDELINES CALCULATIONS

We review <u>de novo</u> the District Court's interpretation and application of the Sentencing Guidelines but accept the court's factual findings unless they are clearly erroneous.  <u>United States v. Ford</u>, 784 F.3d 1386, 1396 (11th Cir. 2015).  Mr. Kreitman challenges the procedural reasonableness of three of the District Court's determinations in calculating his guidelines range.  We address each in turn.

A.  LOSS AND NUMBER OF VICTIMS

Mr. Kreitman first argues the District Court miscalculated the amount of loss and number of victims under the United States Sentencing Guidelines § 2B1.1(b)(1) and (2).  The District Court "needs only to make a reasonable estimate of the loss amount . . . . because often the amount of loss caused by fraud is difficult to determine accurately."  <u>United States v. Medina</u>, 485 F.3d 1291, 1304 (11th Cir. 2007) (quotation omitted).  Estimates are permissible, but they

24

cannot be overly speculative.  Id.  "The amount of loss must be proven by a preponderance of the evidence, and the burden must be satisfied with reliable and specific evidence."  Id. (quotation omitted).

At sentencing, the government sought to hold Mr. Kreitman responsible for $2,333,172.15 in loss.  The District Court found Mr. Kreitman responsible for a $1,634,195.83 loss to 30 victim insurance companies.  Mr. Kreitman objected to this loss amount.  While he conceded that it reflected the proceeds the clinics got from insurance companies, he argued that it did not accurately reflect his conduct because he was not the only chiropractor at the clinics.  On appeal, Mr. Kreitman raises this same argument and says he should be held responsible for much less than this figure because he worked at the clinics only part time and other chiropractors were responsible for substantial portions of the loss amount.  In particular, Mr. Kreitman argues that the District Court failed to make factual findings "that misconduct on the part of other chiropractors was reasonably foreseeable to Kreitman," as it was required to under USSG § 1B1.3(a)(1)(B).

The District Court based its calculation of the loss amount and number of victims on the testimony of a federal agent who examined clinic bank accounts and PIP claim reimbursement information from insurance companies.  The agent presented spreadsheets showing the PIP claims for each insurance company.  At Mr. Kreitman's request, the same agent produced a special calculation representing

25

the loss amount specifically for the time frame he worked at those clinics.  The agent acknowledged it was not possible to determine which chiropractor's submission resulted in each PIP payment.  The District Court determined this was sufficient to establish Mr. Kreitman's loss amount because "[a]s a member of a conspiracy he is held accountable for all of the loss that was generated during the course of the conspiracy.  So it's all relevant conduct that is attributable to him."

This was an incorrect statement of the law.  The Sentencing Guidelines provide that a defendant is only responsible for "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." USSG § 1B1.3(a)(1)(B) (2013).  The Application Notes further state that "[b]ecause a count may be worded broadly," the jointly undertaken criminal activity can be narrower than the scope of the entire conspiracy.  Id. § 1B1.3, cmt. n.2.  In 2015, the Sentencing Commission amended Section 1B1.3 to state that a defendant is responsible for all acts and omissions of others that were "(i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity."  USSG § 1B1.3(a)(1)(B) (2015).  Because this amendment was clarifying, it applies retroactively to Mr. Kreitman's sentence.  See United States v. Presendieu, No. 15-14830, slip op. at *14 (11th Cir. Jan. 19, 2018).  As a result, when determining Mr. Kreitman's accountability for the conduct of others, the

26

District Court should have (1) made "individualized findings concerning the scope of criminal activity undertaken by [the] defendant" and (2) "determine[d] reasonable foreseeability." United States v. Hunter, 323 F.3d 1314, 1319 (11th Cir. 2003) (quotation omitted).

Here, the District Court did not make individualized findings on the scope of criminal activity undertaken by Mr. Kreitman, or whether the actions of the other chiropractors were reasonably foreseeable acts taken "in furtherance of the jointly undertaken criminal activity." See USSG § 1B1.3(a)(1)(B). Instead, the District Court attributed a loss amount and number of victims to Mr. Kreitman merely based on his participation in the conspiracy. This was clear error. We therefore vacate Mr. Kreitman's sentence and remand for the District Court to make individualized factual findings in calculating the loss amount and number of victims attributable to Mr. Kreitman.

B. ABUSE OF A POSITION OF TRUST OR USE OF A SPECIAL SKILL

Mr. Kreitman next argues the District Court erred by finding he abused a position of trust or used a special skill under USSG § 3B1.3. We agree that Mr. Kreitman's conduct did not rise to an "abuse of trust." See United States v. Ghertler, 605 F.3d 1256, 1264 (11th Cir. 2010) (explaining that in the fraud context, this enhancement applies "where the defendant is in a fiduciary, or other personal trust, relationship to the victim of the fraud, and the defendant takes

27

advantage of this relationship to perpetuate or conceal the offense" (quotation omitted)).   In Ghertler, we said sentencing courts must be careful not to be "overly broad" in applying this enhancement because all fraud involves some abuse of trust.  Id. (quotation omitted).  Thus, we concluded, "there must be a showing that the victim placed a special trust in the defendant beyond ordinary reliance on the defendant's integrity and honesty that underlies every fraud scenario."  Id. (quotation omitted).  In Mr. Kreitman's case, there was no showing made by the government that Mr. Kreitman stood in a fiduciary relationship to the victim insurance companies or that they placed special trust in him.  In this case, "there is no basis for concluding that he is 'more culpable' than any common fraudster."  Id. at 1267.

On the other hand, Mr. Kreitman did use a special skill.  The Guidelines define a "special skill" as "a skill not possessed by members of the general public and usually requiring substantial education, training or licensing."  USSG § 3B1.3 cmt. n.4.  Mr. Kreitman does not contest that being a licensed chiropractor qualifies him as possessing a "special skill."  Instead, he says that § 3B1.3 requires he "used a special skill."  Id. § 3B1.3 (emphasis added).  Mr. Kreitman points out that the government's position was that he often did not examine patients and that when he did, he did so only in a perfunctory manner.  He asks us to adopt the approach used by the Sixth Circuit in United States v. Weinstock, 153 F.3d 272

28

(6th Cir. 1998), and to differentiate between his status as a chiropractor and using his skills as one. Id. at 281. To the contrary, the government asks us to adopt the Third Circuit's approach from United States v. Tai, 750 F.3d 309 (3d Cir. 2014), which views the use of a special skill as including any action that requires the "skill and credentials [as] the means by which [a defendant] could participate." Id. at 318.

We adopt the Sixth Circuit's approach to interpreting USSG § 3B1.3. Our reading of the word "use" does not by its plain language include refraining from the use of one's skills. See, e.g., Black's Law Dictionary 1775 (10th ed. 2014) (defining "use" as "[t]he application or employment of something"). But under either definition, the record shows that Mr. Kreitman did indeed use his skills as a licensed chiropractor. Mr. Kreitman admits he examined at least some patients and prescribed them therapies. This necessarily required him to apply and employ his skills, even if he was prescribing unnecessary therapies. We therefore affirm the District Court on this issue.

## C. SOPHISTICATED MEANS

Mr. Kreitman last argues the District Court improperly applied an enhancement based on sophisticated means under USSG § 2B1.1(b)(10)(C). The Guidelines define "sophisticated means" as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense."

Id. § 2B1.1 cmt. n.9(B). Also, "[t]here is no requirement that each of a defendant's individual actions be sophisticated in order to impose the enhancement. Rather, it is sufficient if the totality of the scheme was sophisticated." Ghertler, 605 F.3d at 1267.

Mr. Kreitman argues that the enhancement is inapplicable because he did not use sophisticated means and because the use of sophisticated means by others was not reasonably foreseeable. We disagree. The scheme in this case involved a large number of defendants operating a network of clinics. It included staging accidents; recruiting patients; training patients; setting treatment schedules aimed at maximizing benefits; completing extensive paperwork; and billing a large number of insurance claims. It is hardly plausible for Mr. Kreitman to say that the sophisticated means used by his co-conspirators were unforeseeable. On this record, we agree with the District Court that this enhancement was appropriate.

## VII.  RESTITUTION

We review de novo the legality of a restitution order. United States v. Foley, 508 F.3d 627, 632 (11th Cir. 2007). We review for clear error the District Court's factual findings about the specific amount of restitution. Id.

Mr. Kreitman makes the same argument here as he did in his challenge to the District Court's calculation of the loss amount for which he was responsible under the Guidelines. A restitution order can hold a defendant responsible for the

30

losses caused by the "reasonably foreseeable acts of others committed in furtherance of the conspiracy." United States v. Odom, 252 F.3d 1289, 1299 (11th Cir. 2001). Because we vacated Mr. Kreitman's sentence in order to allow the District Court to reconsider the loss amount, we recognize that the District Court may wish to reconsider the restitution amount as well.

## VIII. CONCLUSION

We affirm Mr. Karow's and Mr. Diehl's convictions and sentences for mail fraud, conspiracy to commit mail fraud, money laundering, and conspiracy to commit money laundering. We affirm Mr. Kreitman's convictions but vacate his sentence and remand for further proceedings.

**AFFIRMED IN PART, VACATED AND REMANDED IN PART.**